1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LORENA ANGELA JOHNSON,                    No.  2:18-CV-0005-DMC

12                  Plaintiff,

13          v.                                 MEMORANDUM OPINION AND ORDER

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                    Defendant.
16

17

18            Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties (Docs. 8 and 10), this case is before the undersigned

21   as the presiding judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).

22   Pending before the court are the parties' brief on the merits (Docs. 27 and 33).

23            The court reviews the Commissioner's final decision to determine whether it is:

24   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

25   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

26   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

27   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

28   a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

                                              1

1   including both the evidence that supports and detracts from the Commissioner's conclusion, must

2   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

3   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

4   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

5   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

6   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

7   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

8   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

9   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

10  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

11  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

12  Cir. 1988).

13              For the reasons discussed below, the Commissioner's final decision is affirmed.

14

15                       **I.  THE DISABILITY EVALUATION PROCESS**

16              To achieve uniformity of decisions, the Commissioner employs a five-step

17  sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§

18  404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

19          Step 1       Determination whether the claimant is engaged in
                         substantial gainful activity; if so, the claimant is presumed
20                       not disabled and the claim is denied;

21          Step 2       If the claimant is not engaged in substantial gainful activity,
                         determination whether the claimant has a severe
22                       impairment; if not, the claimant is presumed not disabled
                         and the claim is denied;
23

24          Step 3       If the claimant has one or more severe impairments,
                         determination whether any such severe impairment meets
25                       or medically equals an impairment listed in the regulations;
                         if the claimant has such an impairment, the claimant is
26                       presumed disabled and the claim is granted;

27  / / /

28  / / /

                                           2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

## II. THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on November 12, 2013.  See CAR 11.[1]
In the application, plaintiff claims disability began on December 13, 2012.  See id.  In her
opening brief, plaintiff states she is disabled due to "a combination of impairments including
complex regional pain syndrome of the left arm and wrist, and chronic wrist sprain."  Plaintiff's
claim was initially denied.  Following denial of reconsideration, plaintiff requested an
administrative hearing, which was held on August 9, 2016, before Administrative Law Judge
(ALJ) Sara A. Gillis.  In a September 30, 2016, decision, the ALJ concluded plaintiff is not
disabled based on the following relevant findings:

> 1.  The claimant has the following severe impairment(s): status post hyperextension injury at the left wrist with a chronic left wrist sprain and complex regional pain syndrome involving the left upper extremity;
>
> 2.  The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;
>
> 3.  The claimant has the following residual functional capacity: light work; the claimant can lift no more than 5 pounds with the left non-dominant upper extremity; the claimant can occasionally push or pull with the left non-dominant upper extremity; the claimant can occasionally climb ladders, ropes, or scaffolds; the claimant can occasionally crawl; and the claimant can handle and engage in fine manipulation less than occasionally with the left non-dominant upper extremity;
>
> 4.  Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> See id. at 13-26.

After the Appeals Council declined review on November 6, 2017, this appeal followed.

/ / /

/ / /

/ / /

_____

[1]    Citations are the to the Certified Administrative Record (CAR) lodged on April 19, 2018 (Doc. 13).

## III. DISCUSSION

In her opening brief, plaintiff argues: (1) the ALJ improperly rejected the opinions of her treating physician, Dr. Gaeta; (2) the ALJ failed to cite sufficient reasons for rejecting her statements and testimony as not credible; and (3) the ALJ's vocational finding is based on vocational expert testimony that was not based on all of plaintiff's limitations.

### A.    Dr. Gaeta's Opinions

"The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another.  See id.

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016). Opinions from "other sources" such as nurse practitioners, physician assistants, and social workers may be discounted provided the ALJ provides reasons germane to each source for doing so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance when opinions from "other sources" may be considered acceptable medical opinions).

///

5

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

/ / /

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

### 1. The ALJ's Analysis

At Step 4, the ALJ evaluated the medical opinions to determine plaintiff's residual functional capacity.  See CAR 20-24.  The ALJ primarily relied on the opinions provided by examining physician, Dr. Gordon.  See id. at 20.  As to Dr. Gordon, the ALJ stated:

> . . .[O]n October 12, 2015, orthopedic surgeon, Dr. Gordon, concluded that the claimant is limited to lifting and carrying no more than 5 lbs. with the left upper extremity, the claimant should perform no activities requiring forceful manipulation or gripping with the left upper extremity, and the claimant can engage in light manipulative activities and gripping with the left upper extremity for two to three hours during an eight-hour workday (Exh. B15F/7).  The undersigned gives great weight to this medical opinion.  Dr. Gordon administered multiple detailed examinations of the claimant, and Dr. Gordon devoted over seven hours to reviewing the claimant's medical records (Exh. B18F/2, 11, 18) in rendering his assessments.  Additionally, Dr. Gordon's determination that the claimant would have considerable lifting, carrying, and manipulative restrictions with the left upper extremity is consistent with examination findings of tenderness and range of motion deficits at the left wrist, skin and temperature changes at the left upper extremity, impaired left grip strength, mild atrophy at the left upper extremity, and intermittently limited range of motion at the left hand, fingers, and shoulder.  For these reasons, Dr. Gordon's medical opinion merits great weight. Accordingly, the undersigned has considered this opinion in evaluating the claimant's residual functional capacity by finding that: the claimant can lift no more than 5 lbs. with the left non-dominant upper extremity; the claimant can occasionally push or pull with the left non-dominant upper extremity (footnote 1) and the claimant can handle and engage in fine manipulation less than occasionally with the left non-dominant upper extremity (footnote 2).

CAR 20.

At footnote 1, the ALJ observed:

> While Dr. Gordon did not specifically address the claimant's abilities to push and pull, the undersigned had considered Dr. Gordon's opinion that the claimant should refrain from forceful manipulative activities by limiting the claimant to occasional pushing and pulling with the left non-dominant upper extremity.

Id.

/ / /

/ / /

/ / /

7

At footnote 2, the ALJ stated:

> As Dr. Gordon notes that the claimant can handle and finger as little as two hours during an eight-hour workday, Dr. Gordon indicated that the claimant can handle and finger less than one-third of the workday. Thus, the undersigned has considered Dr. Gordon's conclusion in assessing the claimant's residual functional capacity by finding that the claimant can handle and engage in fine manipulation less than occasionally with the left non-dominant upper extremity.

> CAR 20.

The hearing decision contains a detailed and lengthy analysis of Dr. Gaeta's opinions. Id. at 20-22. Specifically, the ALJ stated:

> On January 8, 2015, treating pain management provider, Dr. Gaeta determined that (among other things): the claimant can frequently handle, finger, reach, push, and pull with the right upper extremity; the claimant can occasionally reach and handle with the left upper extremity; the claimant can never reach overhead with the left upper extremity; the claimant can never handle, push, or pull with the left upper extremity; the claimant can occasionally lift and carry no more than 5 lbs.; the claimant can frequently lift nothing; and the claimant would be absent more than three times per month from the workplace (Exh. B7F/l-5). In addition, on November 4, 2014, and December 4, 2014, Dr. Gaeta indicated that the claimant cannot use her left hand "to any great extent" and the claimant cannot work (Exh. Bl0F/1; Exh. B14F/26). Furthermore, on July 3, 2015, Dr. Gaeta opined that: the claimant can lift and carry no more than 5 lbs.; the claimant can stand and walk for less than four hours during a normal workday; the claimant can sit for less than four hours during a normal workday; the claimant would have a limited ability to push and pull; the claimant can never climb; the claimant can frequently balance, stoop, kneel, and crouch; the claimant can occasionally crawl; the claimant can frequently twist; the claimant can occasionally reach, handle, and finger; and the claimant can frequently feel, see, hear, and speak (Exh. B12F/5). Moreover, on May 8, 2015, Dr. Gaeta noted that: the claimant cannot lift or carry more than 15 lbs.; the claimant can engage in no forceful or repetitive gripping; and the claimant cannot push or pull greater than 30 lbs. (Exh. B14F/17). Lastly, Dr. Gaeta issued multiple opinions indicating that the claimant would be unable to work (Exh. B11F/12, 61, 68, 71, 80; Exh. B14F/18, 20, 22, 28, 32, 40).

> The undersigned gives little weight to Dr. Gaeta's medical opinions for several reasons. For instance, Dr. Gaeta's opinions contain conflicting information, decreasing their reliability. First, on January 8, 2015, Dr. Gaeta concluded that could never, or "rarely," handle with the left upper extremity (Exh. B7F/3), yet on July 3, 2015, Dr. Gaeta determined that the claimant can occasionally handle (Exh. B12F/6). Second, on January 8, 2015, Dr. Gaeta indicated that the claimant could engage in no frequent lifting (Exh. B7F/3), whereas on July 3, 2015, Dr. Gaeta noted that the claimant could lift 5 lbs. frequently (Exh. B12F/6). Third, while Dr. Gaeta's January 8, 2015 and July 3, 2015 opinions both indicated that the claimant can lift and carry no more than 5 lbs. (Exh. B7F/3; Exh.

8

B12F/6), on May 8, 2015, Dr. Gaeta determined that the claimant can lift or carry up to 15 lbs. (Exh. B7F/3). Fourth, on July 3, 2015, Dr. Gaeta opined that the claimant would have significant standing, walking, sitting, and postural limitations (Exh. B12F/5), whereas on May 8, 2015, Dr. Gaeta acknowledged that the claimant would have no appreciable standing, sitting, walking, climbing, stooping, squatting, or kneeling limitations. (footnote 3) (Exh. B14F/17). Fifth, although Dr. Gaeta noted that the claimant can reach only occasionally through his January 8, 2015 and May 8, 2015 assessments (Exh. B7F/3; Exh. B12F/6), on May 8, 2015, Dr. Gaeta indicated that the claimant would have no reaching limitations (footnote 4) (Exh. B14F/17).

CAR 20-21.

At footnote 3, the ALJ stated:

Dr. Gaeta's May 8, 2015, medical opinion indicated that he would check the boxes next to all activities in which the claimant has restrictions (Exh. B14F/7). Thus, because Dr. Gaeta did not check boxes next to the activities of standing, sitting, walking, stairs/climbing, bending/stooping, squatting, and kneeling, Dr. Gaeta acknowledged that the claimant would not have restrictions performing such tasks (Exh. B14F/7).

Id. at 21.

At footnote 4, the ALJ observed:

As mentioned above, Dr. Gaeta's May 8, 2015, medical opinion indicated that he would check the boxes next to all activities in which the claimant has restrictions (Exh. B14F/7). Therefore, as Dr. Gaeta did not check the box next to reaching. Dr. Gaeta noted that the claimant would have no reaching restrictions (Exh. B14F/7).

Id.

The ALJ provided additional reasons for rejecting Dr. Gaeta's opinions, as follows:

Other factors further diminish the probative value of Dr. Gaeta's medical opinions. First, Dr. Gaeta's opinion that the claimant would have disabling functional limitations lacks support from his treatment notes, which reflect that the claimant realized appreciable benefit from her pain medication regimen and experienced no noteworthy adverse side effects (Exh. B11F/7, 10; Exh. B14F/2, 7, 9, 12, 15, 24). Second, Dr. Gaeta's opinions seemingly indicate that the claimant would have functional limitations related to her right upper extremity and lower extremities, yet Dr. Gaeta's treatment has largely been confined to addressing the claimant's left upper extremity impairment. Third, while Dr. Gaeta indicated that the claimant could have limitations standing, walking, sitting, balancing, stooping, kneeling, crouching, seeing, hearing, and speaking in his July 3, 2015 medical opinion, it is unclear how the claimant's impairments would cause such limitations, and Dr. Gaeta provides no explanations to substantiate these findings (Exh. B12F/5).

Fourth, although Dr. Gaeta opined that the claimant would be limited to lifting and carry 5 lbs., Dr. Gaeta acknowledged that the claimant could lift and carry 5 lbs. with her left upper extremity in his July 3, 2015 opinion (Exh. B12F/5). As the record reflects that the claimant's right upper extremity remains largely unimpaired, it is difficult to imagine that the claimant would have no abilities to lift with her right hand, as Dr. Gaeta's opinion seemingly suggests.

Furthermore, Dr. Gaeta concluded that the claimant would have limitations performing tasks requiring use of parts of the anatomy aside from the left upper extremity. Yet, the record does not support these conclusions. For instance, while Dr. Gaeta opined that the claimant would have limitations using the right upper extremity, examinations of the right upper extremity generally proved unremarkable. The claimant consistently exhibited intact sensation at the right upper extremity (Exh. B1F/4; Exh. B6F/10, 17; Exh. B9F/17), she typically displayed a grip strength of at least 30 lbs. at the right hand (Exh. B1F/27; Exh. B6F/6; Exh. B8F/3; Exh. B11F/54; Exh. B13F/7; Exh. B15F/9; Exh. B18F/30; Exh. B21F/5), the claimant demonstrated negative Tinel's and Phalen's testing at the right upper extremity (Exh. B1F/4, 12, 18-19; Exh. B6F/17), and she showed no significant range of motion deficits at the right shoulder, elbow, wrist, hand, or fingers (Exh. B6F/6, 10, 16; Exh. B8F/8). Furthermore, while treating physical therapist, Dr. Kinsman, noted generalized weakness at the right upper extremity (Exh. B11F/54; Exh. B21F/5), there is no evidence of atrophy at the right upper extremity.

Similarly, although Dr. Gaeta determined that the claimant would have limitations standing, walking, sitting, and engaging in postural activities that do not require the use of the upper extremities the record does not substantiate these opinions. While Dr. Kinsman indicated that the claimant had range of motion limitations at the cervical and lumbar spine and generalized weakness at the lower extremities (Exh. B11F/54; Exh. B21F/5), Dr. Kinsman acknowledged that the claimant had no meaningful sitting, standing, and walking limitations (Exh. B11F/54). Moreover, the record contains no evidence of recurring abnormalities involving the neck, back, or lower extremities.

Lastly, the undersigned affords little weight to Dr. Gaeta's opinions, because in addition to the factors discussed in the preceding paragraphs, Dr. Gaeta's medical opinions are inconsistent with the totality of the evidence. Although the claimant displayed recurring abnormalities at the left upper extremity on physical examination, because objective testing of the left upper extremity yielded generally negative results, the claimant realized appreciable benefit from certain treatments, and the claimant's symptoms have been largely confined to her non-dominant upper extremity, the balance of the evidence does not support a conclusion that the claimant would have work-preclusive functional restrictions.

CAR 21-22.

///

///

2.    Plaintiff's Contentions

Plaintiff argues:

Here, as detailed above, Plaintiff's treating doctor, Dr. Raymond Gaeta, wrote a letter on 11/4/14 in which he opined Plaintiff's diagnosis was complex regional pain syndrome of the left arm and opined Plaintiff could not use her left hand to any great extent. The pain was exacerbated by movement, gripping, pushing, and pulling, and Dr. Gaeta did not believe she was capable of competitive employment as a result of these limitations. (Tr. 605.) On 12/30/14, Dr. Gaeta again opined Plaintiff was unable to work. (Tr. 741.) Dr. Gaeta noted on 1/8/15 that Plaintiff had ongoing left wrist pain from a peripheral nerve injury. (Tr. 524.) He noted Plaintiff's constant pain resulted in sleep disruption. (Tr. 525.) He opined Plaintiff should not lift more than 5 pounds. He opined Plaintiff should never or rarely use her left hand for handling, reaching overhead, or pushing/pulling, and should only occasionally use the left hand for fine manipulation or lateral reaching. (Tr. 526.) He opined Plaintiff's pain frequently interfered with her ability to maintain attention and concentration. Movement worsened Plaintiff's symptoms and she was likely to get worse if she was placed in a competitive work environment. (Tr. 527.) He opined Plaintiff would need a break of 10 minutes every hour and was likely to be absent more than 3 times each month. (Tr. 528.) Dr. Gaeta examined Plaintiff on 6/17/15 and noted Plaintiff's continued wrist pain. (Tr. 776.) Grip testing revealed Plaintiff could not grip over 5 pounds with the left hand. She had positive Tinel's and Phalen's signs on the left. (Tr. 777.) Plaintiff was unable to tolerate most aspects of the examination due to the pain. (Tr. 778.) Dr. Gaeta opined Plaintiff was permanently disabled. (Tr. 779.) He opined Plaintiff could stand and walk for less than 4 hours and sit for less than 4 hours in an 8-hour work day and lift no more than 5 pounds. (Tr. 780.)

The ALJ gave little weight to all of Dr. Gaeta's above opinions, asserting the opinions were not consistent from month to month. The ALJ asserted the treatment notes showed Plaintiff "realized appreciable benefit from her pain medication regimen." The ALJ asserted the record was "unclear" as to how Plaintiff's left wrist impairment would result in limitations related to other parts of her body, such as limitations related to sitting, standing, walking, and the use of the right hand. (Tr. 21-22.) The ALJ asserted Dr. Gaeta's opinions were inconsistent with the totality of the evidence, which the ALJ asserted showed essentially negative objective test results related to Plaintiff's left arm. (Tr. 22.)

In making the above findings, the ALJ erred in failing completely to address the portion of Dr. Gaeta's 1/8/15 opinion indicating Plaintiff would have frequent deficits in concentration as a result of her pain, would need a 10 minute break from work activity every hour, and would likely be absent more than 3 times each month. The limitations in concentrating as a result of pain are supported by the report from examining doctor, Dr. Jacome, who opined Plaintiff had a pain disorder. (Tr. 730.) Social Security Ruling 03-02p governs the evaluation of complex regional pain

/ / /

/ / /

/ / /

11

syndrome and provides the following guidance with regard to the effects of chronic pain on the ability to concentrate:

> Chronic pain and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration, as well as adversely affect his or her cognition, mood, and behavior, and may even reduce motor reaction times. These factors can interfere with an individual's ability to sustain work activity over time, or preclude sustained work activity altogether. When evaluating duration and severity, as well as when evaluating RFC, the effects of chronic pain and the use of pain medications must be carefully considered.

The ALJ provided no reasons for discounting the above described critical aspects of Dr. Gaeta's opinion which, if properly considered, would establish disability. These limitations in attention and concentration, the need for extra breaks, and the likely excessive absences would establish that Plaintiff is disabled even without considering any of the other limitations Dr. Gaeta described.

Additionally, the ALJ erred in asserting the record was unclear as to how Plaintiff's left wrist impairment affected other parts of her body. Plaintiff herself explained at the hearing that her left arm hurts even when she is not using it, especially if it hangs down while she is standing, walking, or trying to use her right hand. (Tr. 42, 44.) The record confirms this testimony, as Dr. Vest's notes indicate Plaintiff had wrist pain even at rest. (Tr. 530-31.) Dr. Gaeta himself explained that Plaintiff's left wrist pain worsened when she moved other parts of her body, and that was the origin of the other types of limitations he assessed. (Tr. 527.) The vocational expert's testimony confirmed that a person who would not be able to sit, stand, or walk for a combined total of 8 hours in a work day, as Dr. Gaeta opined, would not be able to sustain competitive employment. (Tr. 54.)

Plaintiff also argues the ALJ failed to develop the record regarding her complex regional pain syndrome.  According to plaintiff:

> The ALJ also erred in failing properly to consider the nature of Plaintiff's impairment, complex regional pain syndrome. As noted above, Social Security Ruling 03-02p provides guidance on evaluating this impairment, and explains repeatedly that the pain patients with CRPS experience is often out of proportion to the objective medical findings. The Ruling also provides that "It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved. Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources." Thus, if the ALJ was confused regarding the varying limitations Dr. Gaeta assessed from month to month or wished to know more about the reasons why Dr. Gaeta opined Plaintiff's left wrist impairment would affect her ability to perform activities with other parts of her body, then the ALJ should have exercised her duty to fully and fairly develop the record by recontacting Dr. Gaeta for clarification. The ALJ erred in asserting repeatedly throughout the decision that Plaintiff benefitted

12

greatly from treatment. Plaintiff's treating and examining doctors repeatedly noted, as detailed above, that injections, physical therapy, and pain medications were minimally effective and had not restored any of Plaintiff's functional abilities. (Tr. 451, 531, 550, 684, 778, 831.)

3. <u>Disposition</u>

Plaintiff argues the ALJ erred in "failing completely to address the portion of Dr. Gaeta's 1/8/15 opinion indicating Plaintiff would have frequent deficits in concentration as a result of her pain, would need a 10 minute break from work activity every hour, and would likely be absent more than 3 times each month." Plaintiff does not, however, explain how the ALJ failed to adequately address Dr. Gaeta's opinions regarding limitations resulting from plaintiff's chronic pain impairment. Contrary to plaintiff's assertion the ALJ "provided no reasons for discounting the above described critical aspects of Dr. Gaeta's opinion," the hearing decision contains a detailed analysis of Dr. Gaeta's opinions, including those related to chronic pain, and numerous reasons for rejecting them, none of which plaintiff challenges substantively. Plaintiff's conclusory argument is unpersuasive.

Next, plaintiff argues the ALJ erred in stating the record was unclear "as to how Plaintiff's left wrist impairment affected other parts of her body." Plaintiff does not cite the portion of the hearing decision where the ALJ allegedly made this statement, and the court's independent review of the decision reflects no such finding that the record is unclear. To the contrary, the ALJ consistently found any limitations opined by Dr. Gaeta in this regard are not supported by the objective evidence of record. <u>See</u> CAR 20-22.

Finally, plaintiff argues the ALJ erred in failing to develop the record regarding her complex regional pain syndrome. The ALJ has an independent duty to fully and fairly develop the record and assure the claimant's interests are considered. <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts. <u>See</u> <u>id.</u> This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." <u>Cox v. Califano</u>, 587 F.2d 988, 991 (9th Cir. 1978). Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1150.

13

The ALJ may discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

Plaintiff's argument is unpersuasive because she has not identified any portion of the record that is ambiguous or any finding by the ALJ the record is inadequate.  It appears plaintiff's argument is based on pure speculation:  "Thus, if the ALJ was confused regarding the varying limitations Dr. Gaeta assessed from month to month or wished to know more about the reasons why Dr. Gaeta opined Plaintiff's left wrist impairment would affect her ability to perform activities with other parts of her body, then the ALJ should have exercised her duty to fully and fairly develop the record by recontacting Dr. Gaeta for clarification" (emphasis added).  In this case, there is no indication the ALJ was confused or felt she needed to know more.

**B.      Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

/ / /

/ / /

/ / /

/ / /

If there is objective medical evidence of an underlying impairment, the

Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the
> [symptom] itself, or the severity thereof.  Nor must the claimant produce
> objective medical evidence of the causal relationship between the
> medically determinable impairment and the symptom.  By requiring that
> the medical impairment "could reasonably be expected to produce" pain or
> another symptom, the Cotton test requires only that the causal relationship
> be a reasonable inference, not a medically proven phenomenon.
>
> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
> Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged,

including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

physician and third-party testimony about the nature, severity, and effect of symptoms.  See

Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

claimant cooperated during physical examinations or provided conflicting statements concerning

drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

claimant testifies as to symptoms greater than would normally be produced by a given

impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

Regarding reliance on a claimant's daily activities to find testimony of disabling

pain not credible, the Social Security Act does not require that disability claimants be utterly

incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication"). Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." Fair, 885 F.2d at 603. The ALJ must make specific findings in this regard before relying on daily activities to find a claimant's pain testimony not credible. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

### 1. The ALJ's Analysis

At Step 4, the ALJ evaluated the credibility of plaintiff's statements and testimony to determine her residual functional capacity. See CAR 15-20. Primarily, the ALJ concluded the objective evidence does not support plaintiff's allegations. See id. at 15. In this regard, the ALJ provided a detailed analysis:

> . . .[T]he record does not support the claimant's allegations that she experiences disabling symptoms and work-preclusive limitations secondary to her medically determinable impairments.
>
> First, results through objective testing do not substantiate the claimant's allegations of disabling symptoms and work-preclusive limitations due to her left wrist impairment. Left wrist x-rays of January 22, 2013 showed no signs of fracture or dislocation (Exh. B1F/23). Additionally, although an MRI of the left wrist dated February 4, 2013 demonstrated a triangular fibrocartilage complex tear and a complete ulnar attachment tear (Exh. B1F/45), an MRI of the left wrist taken November 11, 2013 revealed only a possible small defect at the scapholunate or lunotriquetral ligaments with no definite ligamentous abnormality, no persisting triangular fibrocartilage complex injury, no ulnar nerve abnormalities, intact flexor and extensor tendons, preserved joint spaces, and normal bony alignment (Exh. B4F/5-6). Moreover, November 5, 2013, left wrist x-rays evidenced no significant degenerative changes, no scapholunate or intercarpal joint space widening, no fracture, and no dislocation (Exh. B6F/12).

Thus, while an MRI of the left wrist taken on February 4, 2013 revealed triangular fibrocartilage complex and ulnar attachment tears, because a subsequent MRI of the left wrist revealed no persisting tears and no definite ligamentous abnormalities, and left wrist x-rays showed unremarkable results, findings from objective testing do not support the claimant's allegations of disabling symptoms and work-preclusive functional restrictions resulting from her left wrist impairment.

The undersigned acknowledges that the claimant's medically determinable impairment of complex regional pain syndrome could cause notable functional restrictions absent abnormal findings through objective testing. However, although the balance of the evidence supports a finding that the claimant would have fairly significant functional limitations in terms of using her left upper extremity (as reflected in the above-cited residual functional capacity assessment), physical examination findings by evaluating sources do not substantiate the claimant's allegations that her left upper extremity impairments and associated symptoms would cause work-preclusive limitations. Just after the alleged onset date of disability, on January 9, 2013, Laine Watanabe, MD of Kaiser Medical noted on examination of the left upper extremity: tenderness over the wrist and flexor tendons, limited flexion and extension at the wrist, and pain with range of motion activity at the wrist and fingers, but no scaphoid or lunate tenderness, only minimal swelling at the wrist, full motor strength, intact sensation, normal reflexes, and negative Tinel's, Phalen's, and Finkelstein's testing (Exh. B1F/4). Similarly, on January 15, 2013, January 22, 2013, January 25, 2013, February 6, 2013, and February 19, 2013, Dr. Watanabe acknowledged tenderness and restricted range of motion at the left wrist, left flexor tendon tenderness, and pain with range of motion activity at the left wrist and fingers, but no scaphoid or lunate tenderness, only minimal swelling at the wrist, and negative left Tinel's, Phalen's, and Finkelstein's testing (Exh. B1F/12, 18-19, 37, 46). Additionally, on March 5, 2013, Dr. Watanabe's examination of the left upper extremity revealed tenderness and limited range of motion at the wrist, pain with movement of the wrist and fingers, and flexor muscle and tendon tenderness, but no persisting swelling (Exh. B1F/51). Furthermore, on March 7, 2013, evaluating orthopedic surgeon, Tung Le, MD, indicated tenderness over the left wrist and forearm, pain with resistance at the left wrist, and an impaired ability to make a fist with the left hand, but no visible deformities at the left wrist, no temperature changes at the left upper extremity, no effusion, no atrophy at the left upper extremity, and negative left Tinel's and Phalen's testing (Exh. B1F/55). Moreover, at medical visits of March 7, 2013, March 21, 2013, April 9, 2013, and April 23, 2013, Dr. Watanabe reported tenderness and limited range of motion at the left wrist, pain with movement at the left wrist and fingers, left flexor tendon tenderness, and tenderness over the left flexor muscles, but no appreciable swelling at the left upper extremity (Exh. B1F/58, 63, 66, 69).

Physical examination findings during the remainder of 2013 also do not support the claimant's allegations of disabling symptoms and entirely work-preclusive limitations related to her left upper extremity impairments. On May 10, 2013, orthopedic surgeon, Edward Damore, MD, noted restricted range of motion at the left wrist and left scapholunate tenderness, but only mild triangular fibrocartilage complex

17

tenderness, just mildly reduced range of motion at the left wrist, no left lateral epicondyle tenderness, and normal sensation at the left hand (Exh. B20F/9). Similarly, on July 23, 2013, Dr. Damore's examination of the left upper extremity evidenced snuff box and scapholunate interval tenderness, as well as limited extension and flexion at the wrist, but no triangular fibrocartilage complex tenderness (Exh. B20F/2). The following month, on August 28, 2013, an attending physician at Northwest Healthcare in Florissant, Missouri, acknowledged tenderness and limited range of motion at the left wrist, but no swelling or redness (Exh. B5F/5). In addition, on September 19, 2013, while the claimant demonstrated tenderness and limited range of motion at the left wrist, evaluating pain management specialist, Gregory Stynowick, MD, noted no obvious swelling at the wrist and no focal neurological deficits at the left upper extremity (Exh. B3F/1). Furthermore, on November 5, 2013, orthopedic surgeon, Bruce Vest, MD, indicated tenderness at the left wrist, limited palmar flexion and dorsiflexion at the left wrist, and positive Tinel's testing at the left elbow, but negative Tinel's and Phalen's testing at the left wrist, no swelling at the left hand, intact supination and pronation at the left wrist, and intact sensation at the left upper extremity (Exh. B6F/16-17). Moreover, on December 2, 2013, Dr. Vest's examination of the left upper extremity demonstrated decreased palmar flexion and dorsiflexion at the wrist and radial carpal joint and scapholunate ligament tenderness, but no triangular fibrocartilage complex tenderness, full pronation and supination at the wrist, only mild swelling at the wrist, intact sensation, and normal range of motion at the elbow (Exh. B6F/10). Later that same month, on December 12, 2013, an evaluating physical therapist reported left scaphoid and lunate tenderness, tenderness at the second left metacarpal joint, guarded movements at the left wrist and hand, weakness at the left wrist, impaired left grip strength, and limited flexion, extension, and ulnar and radial deviation at the left wrist, but intact supination and pronation and no appreciable atrophy (Exh. B6F/6).

Physical examination findings by evaluating sources from 2014 through the date of this determination remain inconsistent with the claimant's allegations of disabling symptoms and work-preclusive restrictions secondary to her left upper extremity impairments. On January 13, 2014, Dr. Vest noted tenderness at the second left metacarpal base, left lateral snuffbox tenderness, decreased palmar flexion and dorsiflexion, and weakness with pronation and supination at the left wrist, but normal range of motion with pronation and supination and only mildly reduced left grip strength (Exh. B8F/8). Similarly, at a January 31, 2014 physical therapy visit, the claimant exhibited left second metacarpal and lunate tenderness, diminished left grip strength, and restricted flexion, extension, and ulnar and radial deviation at the left wrist, but full range of motion with pronation and supination at the left wrist and no atrophy at the left upper extremity (Exh. B8F/2-3). On February 21, 2014, while the claimant displayed tenderness at the left wrist, limited flexion and extension at the wrist, an attending physician at Memorial Hospital in Los Banos acknowledged no obvious atrophy at the left hand or the intrinsic muscles (Exh. B9F/2). The next month, on March 7, 2014, another attending physician at Memorial Hospital reported left extensor tendon tenderness and pain with movement at the left wrist and thumb, but no passive range of motion deficits at the left wrist and no redness (Exh. B9F/7). Shortly thereafter, on March 21, 2014, a physician at

Memorial Hospital indicated tenderness and limited flexion and extension at the left wrist, but normal range of motion at the left hand and fingers and no obvious swelling (Exh. B9F/12). Additionally, on April 7, 2014, an attending physician's examination of the left upper extremity evidenced tenderness at the wrist and the first metacarpal joint and decreased flexion and extension at the wrist, but no swelling at the wrist, normal overall motor strength, and normal sensation (Exh. B9F/17). Furthermore, on May 22, 2014, treating pain management provider, Raymond Gaeta, MD, noted tenderness at the left wrist, limited flexion and extension at the left wrist, and abnormal sensation at the palmar aspect of the wrist, but normal sensation at the left hand and fingers, intact range of motion at the fingers of the left hand, and normal reflexes at the left upper extremity (Exh. B10F/18). Moreover, on September 10, 2014, Dr. Gaeta indicated on examination of the left upper extremity: reduced grip strength, limited flexion and extension at the wrist, and an area of hypersensitivity, but intact reflexes (Exh. B10F/6). On that same day, evaluating physical therapist, Sean Kinsman, DPT, acknowledged impaired grip strength at the left hand, abnormal sensation at the left hand and the left thenar eminence, restricted range of motion at the left wrist and hand, limited range of motion at the left shoulder, positive left Tinel's testing, and generalized weakness at the left upper extremity, but negative left Spurling's testing and intact range of motion at the left elbow (Exh. B11F/54-55).

More recently, on February 2, 2015, evaluating orthopedic surgeon, Leonard Gordon, MD, indicated generalized tenderness at the left wrist, left scapholunate tenderness, marked left radial aspect tenderness, pain with scaphoid shift testing at the left upper extremity, pain with flexion of the fingers at the left hand, in inability to tolerate grip strength testing at the left hand, and atrophy at the left forearm, but intact sensation at the fingers and negative Tinel's testing at the left wrist (Exh. B18F/21, 30). A few months later, on June 17, 2015, Dr. Gaeta reported tenderness and limited range of motion at the left wrist and hand, positive left Phalen's and Tinel's testing, impaired left grip strength, and hypersensitivity at the left hands and fingers, but normal reflexes at the left upper extremity, no swelling at the left hand or wrist, and no atrophy at the left upper extremity (Exh. B12F/1-2). Additionally, on July 6, 2015, Dr. Gordon noted marked tenderness at the left wrist, decreased temperature at the left hand, poor tolerance for grip strength testing at the left hand, and atrophy of the left forearm, but intact range of motion at the left thumb and fingers, normal range of motion at the left wrist, and negative left Tinel's and Finkelstein's testing (Exh. B13F/3-4, 7). Furthermore, on October 12, 2015, Dr. Gordon's examination of the left upper extremity demonstrated tenderness, hypersensitivity, and limited range of motion at the wrist, an inability to tolerate grip strength testing, and slight atrophy at the hand, but normal sensation at the hand, negative Tinel's testing, negative Finkelstein's testing, no radial tunnel tenderness, and intact range of motion at the thumb, fingers, and elbow (Exh. B15F/3-4). Moreover, on October 21, 2015, Dr. Kinsman acknowledged hypersensitivity at the left wrist, trophic skin changes and temperature changes at the wrist, generalized weakness at the left upper extremity, impaired grip strength at the left hand, and limited range of motion at the left wrist and shoulder, but normal range of motion at the left elbow, and only mild range of motion deficits at the left hand and fingers (Exh. B12F/4-5).

Therefore, although the claimant regularly displayed tenderness and limited range of motion at the left wrist, skin changes and temperature changes at the left wrist, and impaired grip strength at the left hand, because the claimant demonstrated only intermittent range of motion deficits at the left hand and fingers, and the claimant generally exhibited full range of motion at the left elbow, only mild atrophy at the left upper extremity, intact sensation over the bulk of the left upper extremity, normal reflexes at the left upper extremity, and negative Tinel's, Phalen's, and Finkelstein's testing, in the collective, physical examination findings by evaluating sources do not substantiate the claimant's allegations of disabling symptoms and work-preclusive functional limitations arising from her left upper extremity impairments.

CAR 15-19.

The ALJ cited additional reasons for finding plaintiff's statements and testimony not credible. Specifically, the ALJ cited plaintiff's course of treatment and evidence of improvement with medication. See CAR 19. The ALJ stated:

In addition, the claimant's course of treatment and her associated response do not support her allegations of disabling symptoms and work-preclusive restrictions arising from her impairments. The undersigned notes that the claimant failed to attain appreciable benefit from multiple treatment modalities for her left upper extremity impairments, including anti-inflammatory medications (Exh. B5F/2; Exh. B6F/14; Exh. B8F/7), a steroid injection at the left wrist (Exh. B3F/1; Exh. B20F/2; Hearing Testimony), physical therapy (Exh. B8F/11; Exh. B13F/3; Hearing Testimony), and occupational therapy (Exh. B1F/58). Yet, the record reflects that the claimant realized benefit from her recent participation in a functional restoration program. For instance, on October 23, 2015, treating physical therapist, Dr. Kinsman, noted that the claimant demonstrated an improved tolerance for activities with her left upper extremity (Exh. B21F/7). Additionally, on November 16, 2015, Dr. Kinsman acknowledged decreased pallor and discoloration at the left wrist, and the claimant stated that she had been able to increase her use of the left upper extremity at home without having significant exacerbations in pain (Exh. B21F/12). Moreover, on November 18, 2016, Dr. Kinsman indicated that the claimant exhibited increased grip strength at the left hand as well as improved sensory tolerance (Exh. B21F/14).

Furthermore, a review of the record reveals that the claimant's left upper extremity symptoms appreciably improved with her medication regimen of Neurontin, Norco, and Elavil. Specifically, the claimant admitted to noticeable improvement in her ability to perform activities of daily living with the foregoing medications (Exh. B11F/7, 10; Exh. B14F/2, 9, 12, 15, 24). Admittedly, at the August 9, 2016 administrative hearing, the claimant testified that she experiences considerable drowsiness from her medication regimen, which would preclude her from engaging in any form of sustained work activity (Hearing Testimony). However, the balance of the evidence does not support these allegations. Most notably, the record reflects that the claimant denied bothersome side effects from

20

her medication regimen at medical visits of October 8, 2014, November 4, 2014, January 29, 2015, May 19, 2015, July 21, 2015, August 20, 2015, September 18, 2015, October 20, 2015, and January 20, 2016, (Exh. B11F/7, 10; Exh. B14F/2, 7, 9, 12, 15, 24; Exh. B21F/20). More recently, at a June 20, 2016 primary care visit, the claimant commented that she experienced only "mild" drowsiness from her medications (Exh. B16F/7). These statements cannot easily be reconciled with the claimant's allegations that she would have work-preclusive functional restrictions resulting from medication side effects.

In brief, although the claimant did not attain meaningful benefit from several interventions, because the claimant acknowledged an appreciable improvement in terms of her functionality with her current medications at multiple medical visits, the claimant informed her treating sources that her medications caused no more than mild adverse side effects, and the claimant demonstrated noticeable progress over only a short period with functional restoration treatment, the claimant's course of treatment and her response thereto are inconsistent with her allegations of disabling pains and work-preclusive restrictions secondary to her medically determinable impairments.

CAR 19.

2.    Plaintiff's Contentions

Plaintiff's argument focusses on the ALJ's finding that the objective medical evidence does not support plaintiff's allegations. Plaintiff argues:

The ALJ asserted the objective evidence, in general, was not consistent with the limitations Plaintiff described. In *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015), the Ninth Circuit addressed a similar issue as follows:

We hold that an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination. To ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination. Here, the ALJ found generally that the claimant's testimony was not credible, but failed to identify which testimony she found not credible and why. We conclude, therefore, that the ALJ committed legal error. This error was not harmless because it precludes us from conducting a meaningful review of the ALJ's reasoning.

Here, the ALJ has not specified which testimony she found not credible and has not provided clear and convincing reasons supported by evidence in the record to support her credibility determination.

/ / /

21

1    Plaintiff does not raise any arguments specific to other reasons cited by the ALJ in finding

2    plaintiff's statements and testimony not credible.

3                    3.    Disposition

4            As discussed above, the ALJ may reject a claimant's statements and testimony as

5    not credible based on the nature of treatment received.  See Bunnell, 947 F.2d at 345-47.  Here,

6    the ALJ noted plaintiff's statements and testimony are not credible because the evidence reflects

7    improvement with a conservative course of treatment.  See CAR 19.  Plaintiff does not challenge

8    the ALJ's analysis in this regard, which the court finds provides an independent and sufficient

9    basis to affirm the ALJ's credibility determination.

10           In any event, the court rejects plaintiff's argument the ALJ failed to provide a

11   sufficient link between the testimony found to be not credible and the reasons cited by the ALJ.

12   To the contrary, the hearing decision reflects the ALJ discussed specific evidence in connection

13   with plaintiff's specific allegations.  In particular, the ALJ discussed in detail the evidence found

14   to undermine plaintiff's allegations regarding limitations resulting from her left wrist impairment.

15   See id. at 15-19.

16       C.    Vocational Expert Testimony

17           The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

18   disability for various combinations of age, education, previous work experience, and residual

19   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

20   and encourage uniform treatment of claims based on the number of jobs in the national economy

21   for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

22   460-62 (1983) (discussing creation and purpose of the Grids).

23           The Commissioner may apply the Grids in lieu of taking the testimony of a

24   vocational expert only when the Grids accurately and completely describe the claimant's abilities

25   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

26   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

27   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

28   exertional strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

"If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities. See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

/ / /

/ / /

/ / /

/ / /

/ / /

Plaintiff argues the ALJ's vocational finding is flawed because the hypothetical questions posed to the vocational expert did not include limitations assessed by Dr. Gaeta or those reflected in plaintiff's statements and testimony. According to plaintiff:

> At step five, the ALJ found Plaintiff could perform the occupations of tanning salon attendant (DOT # 359.567-014), usher (DOT # 344.677-014), and furniture rental clerk (DOT # 295.357-018). (Tr. 25.) In *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988), the Ninth Circuit stated that hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant. If the vocational expert's hypothetical assumptions are incomplete or lack support in the record, the opinion based thereon has no evidentiary value. Here, the ALJ omitted Plaintiff's credible allegations and the limitations assessed by Plaintiff's treating doctor, Dr. Gaeta, as detailed above. Because the VE's testimony that Plaintiff could perform the occupations identified by the ALJ was based on the ALJ's failure accurately to pose all of Plaintiff's limitations, the VE's testimony that Plaintiff can perform those occupations has no evidentiary value. The ALJ's decision is based on evidence which has no evidentiary value, and so that decision is not based on substantial evidence.

In this case, the hypothetical questions posed to the vocational expert reflected the residual functional capacity opined by Dr. Gordon. For the reasons discussed above, the ALJ did not err in rejecting the opinions expressed by Dr. Gaeta or in rejecting plaintiff's own statements and testimony as not fully credible. Therefore, limitations expressed by Dr. Gaeta and those reported by plaintiff do not accurately reflect plaintiff's actual residual functional capacity. Plaintiff's argument at Step 5 is unpersuasive because the ALJ is under no obligation to rely on answers to hypothetical questions which do not accurately reflect a claimant's residual functional capacity. See Embrey, 849 F.2d at 422-23.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# IV.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.     Plaintiff's motion for summary judgment (Doc. 27) is denied;

2.     Defendant's motion for summary judgment (Doc. 33) is granted;

3.     The Commissioner's final decision is affirmed; and

4.     The Clerk of the Court is directed to enter judgment and close this file.

Dated:  March 29, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE